Move on to our second case, numbers 21-2357 and 21-2404, Keralink International v. Geri-Care. And I think, Ms. Giroux, we're going to hear first from you. Yes, thank you. Thank you. May it please the Court, my name is Danielle Giroux, and I represent the appellant Geri-Care Pharmaceuticals Corporation. In this products liability action, the District Court erred for three primary reasons. First, it erred in applying Maryland law to all of Keralink's claims against Geri-Care. Second, it erred in granting summary judgment as to Keralink's favor on the strict liability and breach of warranty claims, finding that the economic loss rule and the sealed container defense did not apply. And third, it abused its discretion in awarding Keralink prejudgment interest in this case. Before you get into it, can I, on your second point, is it your position that the economic loss rule applies to the breach of implied warranty claims? No, Your Honor. That's just a strict liability claim, correct? Yes, Your Honor. I want to start with the choice of law rule. The District Court erred here, finding that Maryland law applies to all of Keralink's claims because the court found that the economic losses were in Maryland, where Keralink's headquarters were located. But under Maryland choice of law rules for strict liability claims, you would look at the place of the wrong, which, in the case cited by the District Court, the Wells decision, that is where the last act that is required to complete the tort occurred. Now, the District Court looked at issues such as where did Keralink purchase these stratipacs? Well, that was in Maryland, but what does that have to do with the tort or where the last part of it occurred? Yes. Counsel, I don't want to mess up your order, but I might mess up your order. It's fine. Because I get the choice of law matters to your implied warranty claims, because if the other state's law applies, you're not in privity and those might go away. And I get how choice of law applies to the dangerous product exception to the economic loss rule. But if you're liable under strict liability, let me say it this way, if your sealed container defense doesn't help you and if you're liable under the economic loss rule, irrespective of the dangerous product exception, does choice of law matter to the claims against your care? Well, it can. It matters. It could matter in two respects. First would be, for example, we argue that New York, Georgia, and Florida laws should apply and privity of contract is required for a breach of warranty in those jurisdictions. I agree with that. But if you're liable for strict liability, the plaintiff probably says, so what? I don't care about all the claims. And so what I'd rather do is if we could talk first about, I want to ask about the economic loss rule. Absolutely. That's fine. So, as it was briefed really by both parties, it seemed like the argument was whether, and the district court seemed to say, if the property other than the product was damaged, then the economic loss rule wouldn't apply. And that's what I kind of want to get at. I'm trying to figure out if that's the right question. I get that if, under the economic loss rule, if product other than the product is damaged, Maryland allows you to recover the value of that property. I think that's, the economic loss rule doesn't stop that. But that's not what is being sought here. What's being sought here is damages based on this fee. And it seems like the argument is all about whether the Maryland Act gives property rights or not, and not whether the claim is not for the value of the damaged property, but something else, which is fee-related damages. Now, you never argued it that way, and I'm trying to figure out if I'm missing something. Because I feel like the party's discussion of economic loss rule might be talking about the wrong issue. I believe that the district court ruled in favor of Carolink in two different ways. First, the court ruled that the exception to the economic loss rule applied because they were seeking compensation to damage to property other than the product itself, which would be the actual tissue. But I don't believe that's what Carolink was claiming in this case. They were not, for example, to answer your question, I'd like to use as an analogy the A.J. DeCaster case, which had to do with the chickens that were suffocated. And in that case, they said, well, of course, you can still claim the value of those chickens. But what you can't do is seek the recovery of lost profits from the diminished egg production of those chickens. And that's the way I see what Carolink was doing here. They're saying that, well, we're not going to claim the loss of the tissue itself. And I don't think they can, because I don't think that's something that they can do under Maryland law, because they don't have an interest in that property itself. What they're claiming is the loss of the revenue, the service fees from the damage to that tissue. And pursuant to the A.J. DeCaster case, I don't see how that is any different than the court saying, well, you would never be allowed to claim lost profits because those chickens that were killed aren't producing eggs anymore. And that's the way I see the issue. So it's your position that the district court determined that the value of the lost tissue was determined by the thieves. And that was an error. That's actually an economic loss akin to lost profits, not the replacement value. Yeah. I'm not aware of anything in the record where they said this is what the replacement cost of the tissue is. The way that they put the value, the way that they computed their damages was by saying this is what we would have gotten had that tissue not been damaged. And that's clearly economic loss under Maryland law, under that A.J. DeCanter case. Okay. Well, how is it purely economic damage? Because it seems to me the Maryland cases, for example, the DeCaster case in 1994 that I believe you cited, talks about only recovery for a purely economic loss, then talks about whether DeCaster has suffered solely economic damages. And it seems to me that what these cases are getting at is we don't want to have in a tort context someone coming in, asking for something that is not as a result of the damage, the wrong that occurred. Okay? So, but the court isn't, it doesn't seem to me that the court is saying that there can't be offshoots. In other words, if there is a damage to the tissue, that losses that are derived from that damage, that you can recover. Seems to me that maybe your better argument is the loss of the employee time that was purely economic, as opposed to the loss of the service fees from the damaged tissue. So how do we, I guess the bottom line of my question is, it seems like the Maryland courts aren't really clear as to why they are using the term or the adjectives purely economic loss, solely economic damages. They're implying that if there is some kind of a hook in terms of property damage, that other consequential or other attending damages are recoverable, even though they have an economic cast. So tell us why the Maryland courts keep using these adjectives purely economic loss, solely economic damages as being prohibited. Well, there may be elements of damage that may be mixed. There may be elements of the damage that they claim that are pure economic losses. And simply because they may claim different damages that could be characterized as either pure economic losses or some mix, doesn't mean that the district court couldn't come in and say, well, you can't recover for these specific damages because these are pure economic losses. But in this case, I believe that all of the damages that they're claiming were pure economic losses. They weren't damage to any property itself. I see my, yeah, go ahead. We got you off track and you tried to start with choice of law. And if it matters, and there are circumstances where it may not matter, but I think I understand your argument of why you think the district court erred. What I'm trying to figure out is if we agree with you hypothetically, what does that mean? Our Wells versus Liddy case kind of dealt with a comparable situation. And it said, you know, in theory, you're supposed to go to the every state, you know, to kind of divide up the case, for lack of a better word. But then it says, but that'd be too complicated. So we'll just do most significant relationship kind of by the fall. First of all, what do you want us to do? And does Wells control what we have to do? I guess, put those in reverse order. Yeah, I believe Wells does control. And just because it may be a more difficult analysis doesn't mean it's the wrong analysis. And here, and I struggled with this in this case, because we're not just dealing with a company that has a headquarters that has these amorphous damages that it feels, you know, throughout the company. We have Carol Inc., which is, while based in Maryland, has a network of iBanks all across the United States. There are damages in, I think, 12 or 13 different states here. And it's not as if we can't isolate those damages. They are clearly divisible. For example, if we're really looking at the connection to the incident itself, of their 585,000 claimed damages, about 330,000 of that can be directly attributed to Florida. So those damages should, a Florida law should apply to those damages. So you want us to divide them up as opposed to doing, I think what Wells ended up doing was saying, what you said, yeah, it can be hard, but they didn't do it. They didn't say, you know, do the most significant relationship. Right. And I think in this case, whether you look at it under, and that's why we argued that in our brief, is whether you look at it from the Wells perspective, you can say what damages were caused in Florida. And it was fairly simple. The documents that were produced show which damages were caused in which iBank. And so it's not that difficult to figure out. But even if you do the substantial relationship test, why is it Maryland in this case? What connection, especially in the strict liability context, when we're talking about a tort, what connection does Maryland have to that tort? The place of the injury, the last act that caused that tort. And it's not Maryland. At least not the factors that the court cited, which would be like where Caroline signed the purchase orders. Like that has nothing to do with strict liability in this case. It's where the contamination occurred or where the negligent acts occurred. And that's why we believe with respect to the choice of law for strict liability, it would be Florida. It could be New York or Georgia. And in all of those, the outcome would be the same. And another reason why it would be important and why choice of law matters is for the economic loss defense. Because while they all have an economic loss doctrine, they differ from Maryland with respect to that public safety issue. And so it can change the outcome of this case depending on which analysis you use for choice of law. I've got one more question. I'm sorry for belaboring this, but I mean, does choice of law apply to the prejudgment interest question? No one argued it, but I mean, Maryland's prejudgment interest statute is pretty different than the ones I'm used to, but no one argued that for some reason. I didn't argue that. And I've never researched it, but for trials that I have in the case where I'm sitting, we always use the law of where the case is pending. I don't know if that's correct or not, but that's why it wasn't argued. OK, thank you. Thank you. May it please the Court. My name is Kelly Lippincott, and I'm counsel for Stratus Healthcare, LLC. There's three sections of the joint record extract that I wanted to discuss during the course of my argument. It all appears in Joint Exhibit Volume 2, and if it's broken into parts, your copy, it would be Part B. The first section I want to talk about is on pages 816 to 818 of the Joint Exhibit Volume 2. The district court erred in granting summary judgment in favor of Care Link on strict products liability, breach of implied warranty, and breach of express warranty. In this case, the sealed container defense shields Stratus from liability. Stratus received the GeriCare iWash from in-source in a sealed container, and a picture of that sealed container appears at record extract page 816. That says on it, on its face, it says that it's GeriCare iWash sterile eye solution. That is the documentation, or that's the label, directly on the packaging. And then if you go to... But Stratus made its own express warranty, didn't it? It repackaged the document and made its own express warranty that this was sterile and must open? And that, Your Honor, I would like to direct you to next section of the record extract, and that's at Joint Exhibit Volume 2, Part B, pages 810 and 811. Those are the pictures of the custom StratiPaks that Stratus compiles. One is for TBI ocular recovery combo packs, and the other one is for posterior pole recovery packs. And those are the complete packaging that the consumer receives that has all the different items that are compiled by Stratus and placed into this packaging. And then there is an index listing what the items are inside those packs, and that's the white piece of paper that you see on page 810 and 811. Now if you go to 813 and 814, those are focusing in on those pages. It's a blowup of those pages that come inside the packs. And those simply list what the items are that are contained in those packs, and that including the eyewash, the sterile eyewash. That is what GeriCare calls their product. That is the item that is included, one of the many items included in both of those StratiPaks. Why not cancel aside from what's under each of those numbered items? Down at the bottom under the barcode, in both versions, it says sterile unless opened or damaged. To me, that's applicable to the whole deal. The testimony in this case explained that there are different kinds of StratiPaks, and sometimes the StratiPaks include two different types of items. There are items that are compiled by Stratis and then sterilized. So the exterior of the items are sterilized. There are other items that are just added into the pack, and once the pack inside is not sterile. For instance, you see that with the custom StratiPak for the TBI ocular recovery combo pack on page 810 and 813, it lists two columns. One is a column of sterile components, and the other is a list of non-sterile components, and underneath that, the sterile eyewash is referenced under the non-sterile components. So Stratis is not sterilizing the outside of the pack, or outside of the GeriCare eyewash bottle, but it does do that sterilization process for some of the items that are contained in the pack. And that's why you see a list of sterile items and a list of non-sterile items. The non-sterile items, like the GeriCare sterile eyewash, is not sterile on the outside of the packaging of the bottle, but the sterility of that eyewash is based on the product that was received from GeriCare that was marketed and identified, described, and labeled by Stratis as sterile eyewash. There was no warranty made by Stratis as to the sterility inside of that bottle. And the language that you see on those labels, the outside index of the items contained in the StratiPak is describing what the product is. The product is sterile eyewash. In this case, it ended up not being sterile. But that is not from any action on the part of Stratis. That is a fault that has been assigned to GeriCare. What about the language that we've been talking about, sterile and less open? They didn't have to make that representation about the contents of the StratiPak, but they did. And that's referring to the entire StratiPak. If you are, when you open certain sections of the StratiPak, that has gone through a sterilization process. But the eyewash itself, the items inside, for instance, a gown, gloves, those are sterile until the pack is opened. When they are packaged, it is a very rigorous process that they have to go through to sterilize the outside of the items. Isn't that a representation as to the product? It is not a representation as to the eyewash because the eyewash is, well, one, it's listed in the non-sterile list column, but also, which is the name of the product. I'm not sure how they can, I guess what they would have just said it was eyewash and not use the word sterile. That's from the front of the label. That is how GeriCare describes its own practice. I'm sorry. Go ahead, Tricia. You go. Well, I'm just, I hear you have some arguments and they may be good ones, I guess, but, I mean, you got sterile in at least three places on the label that you all prepared and sent with your product. And it seems like you're trying to say, well, we didn't really mean it or we didn't mean it for everything. And, you know, I hear you. Maybe that ends up winning. I would have, I'm sorry, I would agree with Your Honor if this was a situation where they undertook to include sterile eyewash in the StratiPak. But instead of getting sterile eyewash, they got, I don't know, re-wetting drops or they got some other saline solution that maybe wasn't sterile and stuck that into the pack. But what they got was a sealed container from GeriCare that was labeled and described on the labeling as sterile eye solution. And that is what they put on their packaging and their index for this package was to just describe what was there. And they used the words that GeriCare used simply to describe the product. And they were not making a representation or a warranty and they couldn't warrant it. They did not control the packaging or the manufacturing of this product, GeriCare did. Thank you. You've got, I think, some rebuttal time. Thank you, Your Honor. Okay. Please report. Good morning. My name is John. I'm a Bush Lawyer. I represent Paralink. And I had trouble preparing for this one because I figured there'd be a lot of questions from a lot of different directions. And I feel strongly that Judge Blake got it right in just about every respect, including choice of law, including sealed container defense, including economic loss rule. I'm going to take my clues, or cues, I suppose, then, from the questions I've already heard. I don't have a set presentation and part of me was going to say I'm not going to say anything unless I'd be happy to answer your questions, but I do want to respond at least to some of what I've heard. I think, Judge Keenan, you have it absolutely right that the Court of Appeals of Maryland, like most courts, and certainly most appellate courts, and certainly most appellate courts of highest resort, use words carefully. And when they have used the word purely in the economic loss context, when they use the word solely in the economic loss context, they do so for good reason. And I think that the reason is this, Your Honor. The damage to property, or personal injury, but we're in the property context, caused by a defective product, a damage to property other than the product itself, is different. If you only have a defective product, then you don't have the benefit of the bargain. And so your damage is purely economic. You replace that product. But when the defective product itself injures a person or damages property other than the product itself, then that is a trigger to a new paradigm. And if you can point to damage flowing from the property damage itself, consequentially, caused by this defective product, then you no longer are arguing about pure economic loss. You're talking about economic loss accompanying property to damage. So counsel, it sounds like you're saying, I was trying to figure this out through the to the property other than the product itself, here where you have damage to the tissue. Is it your position that if that occurs, we're kind of, economic loss rule, we can put that aside and don't have to worry about it. You're now entitled to go after purely economic losses? I think purely economic losses attendant to a property damage. I'll give you what I, I was trying to come up with a reverse analogy, which is a game I play with myself sometimes, a very frustrating one. But let's take the AJ DeCoster switch manufactured by Westinghouse, and instead of putting it in a chicken house, let's put it in a restaurant. And it doesn't go off, and it's a 95 degree day with 10,000% humidity, and nobody wants to come in there. So the restaurant, until that switch is repaired, suffers an exodus of customers for a week or for two days. But no property damage. It cannot recover the sales it did not make, because the only damage, the only injury is to the product itself. Well, do you have, I mean, do any of your damage categories, I mean, the product was damaged. Sure. I mean, we, I don't think anyone disagrees with that. Yeah. But do any of your elements of damage, your monetary claims, involve something that's not economic losses? The problem, I can't give you a... That should be, answer it however you want, but you would think that would be a yes or no answer. Well, and I would think it would be if we were not talking about corneal tissue, which is not a normal product. Because the damage to the corneal tissue, if we're going on, quote, non-economic damages, is the replacement of that tissue, right? And the only way we can do that, I can't go to a store and buy this. So I have to go to the Carolinx of the world, as long as I'm doing it appropriately under the Uniform Act, and it's used for therapy or treatment or education or whatever. And I'd have to get it. So I would argue that the losses that Carolinx suffered are equivalent to the replacement value. So that's your argument, that because we have a unique situation here of, you know, body tissue that you can't replace like you could a shoe or something like that, then you get to kind of skip over the fact that the economic loss rule in coal, what would otherwise be economic loss is the value of the property? Well, to be clear, I believe that once we have damage to property, the first step of the argument that the economic loss goes away. But to address your question more directly, notwithstanding my assertion, I believe that when there is damage to property, such as the chickens, then you replace the chickens. Whatever that cost is. When you're talking about corneal tissue, theoretically, you replace that tissue. Whatever, you know, what is the cost of that? That is equivalent in this very weird and unique market to what is, in essence, the cost. Because to replace them, we would get the tissue, and then there are significant resources invested by the laboratory and the technicians at Carolinx to process to very specific FDA regulatory standards, but also to surgical standards, different types of grafts. And that's a significant investment, and that is largely, those costs are what drive the service fee that is charged at the end of the day. Counsel, just for purposes of helping me to understand sort of the examples here, I thought the district court said, in applying the economic loss rule, that the property in question was not actually the tissue, because under Maryland law, Carolinx doesn't have a property interest in body parts. The property at interest was actually the service fees. No? I didn't, you know, you may have read it more subtly than I did, and I'm going to give you a real candid answer. I didn't get that far in my analysis of what Judge Blake read. I think I was just pleased with the outcome. But I think, following up on your read of it, sure, service fees are an intangible property right. But so are, that would swallow up the economic loss rule, right? I mean, that can't be right, but maybe, it seems to me like any claim for lost profits would be subject to the same assessment. Is that, am I missing something there? I think, I don't know that you're missing anything. I think it's a very good question. I think you're looking for a limiting principle. And I think the limiting principle here is the damage to property. Well, this is going back and forth between the service fees and the corneal tissue. I don't believe, by the way, Judge Harris, that the court said that there was no property interest. Couldn't be. She said, as I recall her analysis, is that there are property interests that are appropriately limited. Right. And so I thought what the limit was, was that in this case, your property interest is the interest in the service fees. Okay, see, I didn't, that's the leap I didn't make. And I don't mean to say it's a leap. Maybe she made that. No, I didn't misread it. What about the employee time? You know, nobody seems to be concerned about that in this case, really arguing it much. But it seems to me that that's the red flag of pure economic loss, isn't it? Well, it is if we're going to divide this up. I'm advocating, Your Honor, for there is a trigger. I mean, that's really not the point they're making. It's not the point they're making. So I'm kind of going out on a hunt myself. But I'm interested in your reaction to that. Well, my reaction to it is what I articulated early on, is that if you have a defective product that does not damage property other than itself, then you are left, other than replacing that product, giving the consumer the benefit of the bargain, you can't get anything else. But when it does, in fact, injure property, then I think it triggers the elimination of the economic loss rule. I believe that's what a court of appeals in Maryland means when it talks about purely and solely. So what you're saying then, if I get this correct, is that the Maryland Court of Appeals is saying that if the only damages sought in this case were employee loss time, that would be unrecoverable, per se. But because it's in a basket with other recoverable charges, if we hold that the service fees are recoverable, then the entire basket of loss is recoverable. Is that what you're saying they're saying? That's what I'm saying. I think you said it better than I did. But I agree that this basket, once you have put property damage into that basket, along with economic loss, as long as there's property damage and damage associated with that. Yes? Can I ask maybe a basic question? You don't have to answer this because it may be legal strategy. So please just say, I won't hold that against you at all. But it seems like you got a fair amount. I know it won't be conceded, but a pretty clear implied warranty claim against Stratus. And joint and several liability judgment against Stratus on the implied warranties, they're fighting about strict liability and express warranty. But why do you care? I mean, you're doing a lot of gymnastics and stuff like that. What's going on? Here's my candid answer and my litigation strategy. Affirm just one of the judgments, and I'm happy as a clam. Right. But the district, and that seems to me as possibly a question that arises from the final judgment. The final judgment, to borrow a word from the previous case, aggregates the damages. It doesn't parse them out. Right. With strict liability, the implied warranty, express warranty. So, and holds GR Care and Stratus jointly and severally liable for the amount. So is it your position then that if we affirm on strict liability, the rest doesn't matter? Yes. I'm trying to think that through. Okay. And tell us why. Well, going, retreating from my more jocular comment, the judge in response to, you know, I'll take any win. What we have are different ways of dressing up with slightly different elements, but the same essential claim and the damages that flow from that. Whether you get to those damages through strict products liability, through breach of warranty. And there is a finding by the district court as to each of these defendants as to strict products liability and as to warranty. It's a different warranty with respect to the two different, you know. Right, but I'm saying here we have one judgment. One judgment. $606,000. So tell me whether it matters the different theories of recovery if one of them succeeds against both defendants, Stratus and GR Care. If strict products liability survives as to both defendants, then I don't think it matters. I think you have a joint and several judgment with a full measure of damages. Okay, why is that? Because ultimately their actions, albeit different, one being predicated on a breach of an express warranty. Well, that's not true. They're both under the same rubric. Their actions individually combine to cause the same injury. Can I ask you a question? One level higher in the outline about what matters. Am I understanding right that the economic loss problem, there are sort of, I'm not sure this is exactly the right way to think about it, but two exceptions. One is this property damage exception on which the district court relied. But the other one is this public safety exception. And there's a lot of law on that in Maryland and it seems pretty favorable to you without sort of getting into it or anything. Wouldn't that have been the more straightforward way to resolve this issue? Well, I argued it and Judge Blake, for her own reasons, decided that based on property damage which I think she believes is clear and solely in the... Well, don't you think she also did possibly to avoid the possible choice of law issue? I mean, she mooted the choice of law issue when she didn't rely on the public safety exception, didn't she? Well, I think she may have mooted... Because essentially if there was error, it was harmless because there was nothing different about Maryland law regarding economic loss. I think she figured correctly that she didn't need to go there. I agree that it's much more straightforward but she did, ironically, in the context of strict products liability, discuss the risk to human health posed by this. Now, the standard, by the way, of risk to human health and I'm using the vernacular not the correct words but under strict product liability versus the economic loss doctrine, I think there may be a level of urgency associated with one that may not necessarily be probative of the other but they are certainly very closely... But that issue, the exception Judge Harris is talking about applies under Maryland law. So for that to be the basis of affirming the... For that to be the basis of saying the economic loss rule doesn't apply, we'd have to affirm on the Maryland choice of law correction or decision, correct? Well, I don't fully agree. There are other jurisdictions that were raised. Which one has that exception? I think the District of Columbia does. I cannot recall, candidly, I'm trying to juggle too many laws and too many issues but I think a number and I'm not gonna characterize it beyond a number of the other jurisdictions recognize that. Can I direct your attention to choice of law a little bit now? Yes, sir. So, it seems like under your theory that the choice of law in the District Court's decision about the choice of law is determined where I guess the economic effects of the contamination are felt. And don't worry if I said that a little bit wrong. But doesn't that essentially say the plaintiff's the plaintiff's residency or the place where the plaintiff is located is always gonna be the place where that state's law is gonna apply? I can't say that that's always. I think in a small business context and this is notwithstanding its presence in a number of jurisdictions. This is a small non-profit business where all of its ordering is centralized where all of its contracting is centralized where the normal last acts in tort law in Maryland at least the last act necessary to give rise to the liability in tort is injury. Where do you suffer the injury? And the injury here I would assert and I believe have asserted is the inability to transfer this stuff as well as the need to destroy it to segregate it and that all happens in Maryland as well as the financial fallout from that but all of the significant actions whether under the warranty theory or the tort theories are all centralized in Maryland. Now the happenstance that that Carol Link has a number of subsidiary procurement agencies or people in different states where they gather the donated material and then expose it for the first time packaged up processed and sent to Maryland is I don't think changes that I don't think the injury is complete. So if I live in South Carolina and if I'm in rental property in Florida and I have some heater that I buy to heat my storage property in Florida I buy some heater to keep it warm in there and the heater is defective and everything catches on fire and all that it does that and it burns it down are you saying because I live in South Carolina that's where my finances are that's where the tort is completed? I think I missed the first part there's a defective thing in your house? No I buy storage units that are everywhere in Florida and I have a heater in there and it's defective and it catches everything on fire I don't believe in that instance what's different? The difference is what jurisdiction has the most significant interest in that Florida that's a different test the question if we want to apply most significant interest test what you have said is the place where the tort is I'm sorry I just went off track a little bit I would argue that what you've lost in Florida are your chattels whereas the locus of the injury for the corneas and the other several thousand corneas that are sitting on its shelves that it cannot and may not use and must destroy so again the problem paradigmatically all through this case in trying to talk about concepts of tissue and other areas all I  respond as best as I can your honor thank you very much I think Ms. Giroux you've got rebuttal time I disagree with the concept that in a case like this a plaintiff can bootstrap economic losses that normally would not be recoverable simply because there has been damage to property other than the product itself that does not give them a blank check and open license to claim all of these purely economic losses if so why would the court in its opinion of segregating out here's what you can claim in the context of those chickens that's what the court did and I haven't heard to me that the eggs that were lost by those chickens are analogous to the loss of the tissue in this case and just like in AJ DeCoster the court says you can't get the loss profits from the loss of those eggs likewise they can't get those loss profits from the loss of the tissue in this case it doesn't matter that the tissue was damaged even if you believe that it was property they still can't bootstrap all those other damages then the better analysis would be to analyze the damages to see which are economic losses and recoverable losses on that point are there any losses I'm trying to figure out are there any other damages I believe there are damages storage disposal those type of process damages all economic losses your position is every damage is economic in nature yes they are not claiming replacement costs I don't think they can do that under Maryland law that's not what they're doing they value the tissue based on what they would have earned through the services they provide the disposal all of those services relating to the implantation of the ocular tissue not to the tissue itself it's not like the chickens this is separate from that just because this is an unusual situation does not warrant us completely rewriting the economic loss in Maryland there's no reason to deviate from what the court held in that case thank you very much thank you very much thank you very much I would like to close by just focusing in again on the sealed container defense in Maryland and how this shields shields my client Stratus the I wash was contained in sealed container Stratus was not only not aware of any defects but had no reason to suspect any defects and relied on the representations and the warranties provided by Gericare Stratus was exercising reasonable care and couldn't have discovered any contamination through visual inspection Stratus did not manufacture, produce, design or set forth specifications like what Gericare did in terms of the Gericare I wash and Stratus did not alter, modify, mishandle in any way this product in any way that was the proximate cause of the damages here it was all the mishandling by Gericare of this what should have been sterile I wash and was represented to be sterile I wash Counsel, what's your defense to the implied warranty claims against Stratus so I try to break it down into the elements and look at the basic elements of an employed warranty claim first the existence of a defect I would question that there whether or not there is any existence of a defect what Stratus was required to provide and asked to provide in its agreement with Care Link was to find and get them I wash, sterile I wash and put it in the custom StratiPaks that's exactly what they got from Gericare, they were not involved in the manufacturing so you're saying if you pass on these packs with contaminated I wash for use in this process of extracting and doing transplants you've not breached the implied warrant of merchantability or fitness for a particular purpose our obligation and what we did was get I wash, sterile I wash that was sealed and in a sealed container why do you say that's your obligation doesn't the law imply that you also have an obligation to make sure the product is fit for its intended use and that's exactly what Stratus did how does it fit for its intended use if it's contaminated they went into the marketplace they found FDA regulated sterile I wash that was in a sealed container that was identified as sterile I wash but why isn't that a fight between you and I know you've got a fight that's a great argument in your identification contribution claim how does that matter now your honor we do of course have that fight but that therein lies is what I view is the real defect here is that is the product that we got from Gericare was not the product that we should have received now the attribution the second element attribution of the defect to the seller again we were not involved in any way in the manufacturing packaging of what should have been sterile I wash we were in no way responsible for the I wash not being sterile and finally that causal relation then falls apart too because that alleged defect we got what we were obligated to get for that we got FDA approved and regulated sterile I wash the fact that it was not squarely falls on the shoulders of Gericare and not on Stratis unless there's any other questions from the court thank you very much again we are sorry that we can't follow our normal custom of coming down and shaking hands but we do appreciate your help today with these cases and we'll ask the courtroom deputy to adjourn us for the day this honorable court stands adjourned until tomorrow morning God save the United States and this honorable court
judges: Pamela A. Harris, A. Marvin Quattlebaum Jr., Barbara Milano Keenan